1

2   Christopher K. Leung (SBN 210325)
    Pollock Cohen LLP
3   111 Broadway, Suite 1804
    New York, NY 10006
    Tel.: (212) 337-5361
4   Fax.: (347) 696-1227
    Chris@PollockCohen.com

5   *Counsel for Plaintiffs African American Tobacco*
    *Control Leadership Council, Action on Smoking and*
6   *Health, American Medical Association, and*
    *National Medical Association*
7

8                  UNITED STATES DISTRICT COURT

9                 NORTHERN DISTRICT OF CALIFORNIA

10                      OAKLAND DIVISION

11
                                        )
12  AFRICAN AMERICAN TOBACCO            )   Case No.: 4:20-cv-4012-KAW
    CONTROL LEADERSHIP COUNCIL,         )
13  ACTION ON SMOKING AND HEALTH,       )   **MEMORANDUM OF POINTS AND**
    AMERICAN MEDICAL ASSOCIATION,       )   **AUTHORITIES IN SUPPORT OF**
14  and NATIONAL MEDICAL                )   **PLAINTIFFS' MOTION FOR**
    ASSOCIATION,                        )   **ATTORNEYS' FEES AND COSTS**
15                                      )
                                        )
16          Plaintiffs,                 )
                                        )
17      vs.                             )
                                        )
18                                      )
    U.S. DEPARTMENT OF HEALTH AND       )
19  HUMAN SERVICES; XAVIER BECERRA,     )
    in his official capacity as Secretary of the U.S.  )
20  Department of Health and Human Services;  )
    U.S. FOOD AND DRUG                  )
21  ADMINISTRATION; ROBERT M.           )
    CALIFF, in his official capacity as  )
22  Acting Commissioner of the U.S. Food and  )
    Drug Administration; CENTER FOR     )
23  TOBACCO PRODUCTS; MICHELE           )
    MITAL in her official capacity as Acting  )
24  Director, Center for Tobacco Products,  )
                                        )
25                                      )
            Defendants.                 )
26                                      )
                                        )
27  ────────────────────────────────

28

Memorandum of Points and Authorities In Support of Plaintiffs' Motion for Attorneys' Fees and Costs
Case No.: 4:20-cv-4012-KAW

# TABLE OF AUTHORITIES

**Cases**

*Anthony v. Sullivan*,
   982 F.2d 586 (D.C. Cir. 1993) ................................................................................ 16

*Arrow Reliance, Inc. v. Woodcock*,
   Case No. 22-1057, 2022 U.S. Dist. Lexis 138988 (W.D. Wash. Aug. 4, 2022) ........ 18

*Atkins v. Apfel*,
   154 F.3d 986 (9th Cir. 1998) .................................................................................... 24

*Bell v. Clackamas County*,
   341 F.3d 858 (9th Cir. 2003) .................................................................................... 22

*Camacho v. Bridgeport Financial, Inc.*,
   523 F.3d 973 (9th Cir. 2008) .................................................................................... 22

*Carbonell v. INS*,
   429 F.3d 894 (9th Cir. 2005) .............................................................................. 12, 15

*Costa v. Comm'r of Soc. Sec. Admin.*,
   690 F.3d 1132 (9th Cir. 2012) .................................................................................. 20

*Davis v. Prison Health Servs.*,
   No. C 09-2629 SI, 2012 WL 4462520 (N.D. Cal. Sept. 12, 2012) ........................... 24

*Envt'l Defense Fund, Inc. v. Watt*,
   722 F.2d 1081 (2d Cir. 1983) ................................................................................... 16

*Fischer v. SJB-P.D. Inc.*,
   214 F.3d 1115 (9th Cir. 2000) .................................................................................. 12

*Gonzalez v. City of Maywood*,
   729 F.3d 1196 (9th Cir. 2013) .................................................................................. 23

*Hensley v. Eckerhart*,
   461 U.S. 424 (1983) ................................................................................... 19, 20, 23

*Ibrahim v. U.S. Dep't of Homeland Sec.*,
   912 F.3d 1147 (9th Cir. 2019) .................................................................................. 16

*In re Bluetooth Headset Products Liab. Litig.*,
   654 F.3d 935 (9th Cir. 2011) .................................................................................... 20

*INS v. Jean*,
   496 U.S. 154 (1990) ....................................................................................... 16, 17, 24

*Int'l Woodworkers of America v. Donovan*,
   792 F.2d 762 (9th Cir. 1986) .................................................................................... 25

*Latoya A. v. S.F. Unified Sch. Dist.*,
   No. 3:15-cv-04311-LB, 2016 U.S. Dist. LEXIS 11048 (N.D. Cal. Jan. 28, 2016 .................. 23

*League for Coastal Prot. v. Kempthorne*,
   No. C 05-0991-CW, 2006 WL 3797911 (N.D. Cal. Dec. 22, 2006) ........................... 15

*Love v. Reilly,*
   924 F.2d 1492 (9th Cir. 1991) ........................................................................16, 21

*Meier v. Colvin,*
   727 F.3d 867 (9th Cir. 2013) ..........................................................................16, 17

*Meza-Vazquez v. Garland,*
   993 F.3d 726 (9th Cir. 2021) ...................................................................................12

*Moreno v. City of Sacramento,*
   534 F.3d 1106 (9th Cir. 2008) .................................................................................24

*Nadarajah v. Holder,*
   569 F.3d 906 (9th Cir. 2009) ............................................................................20, 22

*Nat. Res. Def. Council v. Envt'l Prot. Agency,*
   703 F.2d 700 (3d Cir. 1983) ....................................................................................16

*Perez v. Rash Curtis & Assocs.,*
   Case No. 4:16-cv-03396-YGR, 2020 WL 1904533 (N.D. Cal. Apr. 17, 2020) ......23

*Pollinator Stewardship Council v. U.S. EPA,*
   No. 13-72346, 2017 WL 3096105 (9th Cir. 2017) ..................................................21

*Prison Legal News v. Schwarzenegger,*
   561 F.Supp.2d 1095 (N.D. Cal. 2008) ....................................................................24

*United States v. 515 Granby, LLC,*
   736 F.3d 309 (4th Cir. 2013) ...................................................................................16

*United Steelworkers of America v. Phelps Dodge Corp.,*
   896 F.2d 403 (9th Cir. 1990) ............................................................................22, 24

*Webb v. Bd. of Educ. of Dyer Cnty., Tenn.,*
   471 U.S. 234 (1985) .................................................................................................23

*Wood v. Burwell,*
   837 F.3d 969 (9th Cir. 2016) ...................................................................................12

**Statutes and Rules**

21 U.S.C. § 387a ..........................................................................................................2

28 U.S.C. § 2412 ....................................................................................15, 20, 25

**Regulations**

78 Fed. Reg. 44484 (July 24, 2013) ...........................................................................4

84 Fed. Reg. 29623 (June 24, 2019) ..........................................................................5

87 Fed. Reg. 26454 (May 4, 2022) ...........................................................................11

**Other Authorities**

Campaign for Tobacco-Free Kids, Press Release (Apr. 29, 2021) ............................19

CDC, Smoking & Tobacco Use .................................................................................19

Congressional Record (Vol. 155, No. 55) ...................................................................2

Congressional Record (Vol. 155, No. 88).................................................................2

Fed. Trade Commission, Cigarette Rept. for 2017...............................................6

Food and Drug Administration, 2010 TPSAC Meeting Materials and Information ....................3

Food and Drug Administration, 2011 TPSAC Meeting Materials and Information ....................3

Food and Drug Administration, Charter of the TPSAC (Aug. 7, 2009)........................3

Food and Drug Administration, Dr. Lawrence R. Deyton, Dir. Center for Tobacco Products, *FDA Remarks on the Report and Recommendation on the Public Health Impact of Menthol Cigarettes* (Mar. 18, 2011)................................................................3

Food and Drug Administration, FY 2023 FDA Budget Summary ..............................19

Food and Drug Administration, Menthol and Other Flavors in Tobacco Products ....................6

Food and Drug Administration, News Release (Apr. 29, 2021).................................10

Food and Drug Administration, Rept. to Congress, *Progress and Effectiveness of the Implementation of the Family Smoking Prevention and Tobacco Control Act* (2013).................................................................3

Food and Drug Administration, Statement from FDA Commissioner Scott Gottlieb, M.D. (Nov. 15, 2018)................................................................5

H. Rept. 111-58.............................................................................2, 6, 17

H. Rept. 96-1418............................................................................19

Health and Human Services, Agency Rule List – Fall 2019 (Dec. 26, 2019) .................5

Laurie McGinley, *In a milestone, FDA proposed ban on menthol cigarettes, flavored cigars*, Washington Post (Apr. 28, 2022)................................................................12

Michael Felberbaum, *FDA: Menthol cigarettes likely pose health risk*, USA Today (July 23, 2013) ........4

Nat'l Cancer Inst., FDA Proposed Rule Prohibiting Menthol Cigarettes (June 27, 2022) ...........19

Sheila Kaplan, *Altria to Stop Selling Some E-Cigarette Brands That Appeal to Youths*, The New York Times (Oct. 25, 2018).................................................................5

TPSAC Menthol Cigarettes and Public Health: Review of the Scientific Evidence and Recommendations (2011)................................................................3, 4

iv

**INTRODUCTION**

Pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, the plaintiffs African American Tobacco Control Leadership Council, Action on Smoking and Health, and National Medical Association seek attorneys' fees and costs as the "prevailing party" in this litigation.

As detailed below, plaintiffs largely obtained what they set out to achieve—namely, (a) substantive response by the U.S. Food & Drug Administration ("FDA") to plaintiffs' 2013 Citizen Petition, (b) a determination by FDA whether menthol should be added to the list of banned characterizing flavors in cigarettes, pursuant to 21 U.S.C. § 387g(a)(5) ("Section 387g(a)(5)); (c) a timeline by which FDA would publish its Notice of Propose Rulemaking (to ban menthol as a characterizing flavor, and (d) short of that, an explanation from FDA as to why it had delayed in addressing the critical health problems caused by menthol in cigarettes.  Plaintiffs obtained this relief with the necessary "judicial imprimatur" of this Court's Orders issued on September 15, 2020, November 12, 2020, December 1, 2020, and November 17, 2021.

Defendants furthermore cannot meet their heavy burden to show that their underlying delay and their litigation positions were substantially justified.  And, because the equities do not weight in favor of absolving FDA's inaction here, this Court should grant plaintiffs' motion here. Plaintiffs' success here helped to address a major roadblock to health equity in the United States, affecting the millions of present and future lives threatened by menthol-flavored cigarettes. Given such results, plaintiffs' requested fees are reasonable, particularly when compared to the market rates for similar complex civil litigation work in this judicial district.

**BACKGROUND**

The basis for plaintiffs' lawsuit is drawn from the public health problem of menthol in cigarettes and defendants' inaction.  A short recitation of that history is included here, with additional details and source materials provided by plaintiffs' initial complaint.

**I.      Congress' direction to the FDA:  Address menthol in cigarettes.**

In 2009, Congress enacted the Family Smoking Prevention and Tobacco Control Act, Pub. L. No. 111-31, 123 Stat. 1776 (codified, in relevant part, at 15 U.S.C. §§ 1333–34 and 21 U.S.C. § 301 *et seq.*) (2009) ("Tobacco Control Act").  This Act authorized the U.S. Food & Drug

Memorandum of Points and Authorities In Support of Plaintiffs' Motion for Attorneys' Fees and Costs
Case No.: 4:20-cv-4012-KAW

Administration ("FDA") to regulate tobacco products, 21 U.S.C. § 387a, and prohibited all flavors in cigarettes, save for tobacco and menthol, *id.* § 387g(a)(1).  At the time, Congress recognized that menthol cigarettes "may pose unique health risks to those who smoke them."[1] Congress was "especially concerned about proportionately higher rates of menthol cigarette use among African American smokers"; "the historic targeting of African Americans for menthol cigarette use by tobacco companies"; "the high rates of [menthol cigarette] use among … African American youth"; and the "higher rates of lung cancer documented among African American smokers as compared to non-African American smokers[.]"[2]

To address these problems, Congress took steps to ensure that the problem of menthol in cigarettes would be "an early focus" for FDA and that the agency would be authorized "to deal with these and other products."[3]  To that end, Congress directed FDA to (1) create a Tobacco Products Scientific Advisory Committee, *see id.* § 387q(a); (2) refer "[i]mmediately" to this Committee for report and recommendation the issue of menthol in cigarettes and the public health, *see id.* § 387g(e)(1); and (3) reevaluate periodically the flavor ban (which had omitted menthol) "to determine whether such standard[] should be changed to reflect new medical, scientific, or other technological data," *id.* § 387g(a)(5).

Congress also "urge[d] the Secretary [of the Defendant U.S. Department of Health and Human Services ("HHS")] to address these issues as quickly as practicable" (H. Rept., Part 1 at 38), believing that it would be "***critical*** for the Secretary ***to move quickly*** to address the unique public health issues posed by menthol cigarettes."  *Id.* at 38–39 (emphasis added).

## II.    The FDA's undue and unjustified delay

Following the Tobacco Control Act's passage, the FDA the formed the Tobacco Products Scientific Advisory Committee ("TPSAC" or "Committee") to survey and assess the available

---

[1] H. Rept. 111-58, Part 1, Tobacco Control Act, 111th Congress (2009–10), 38 (Energy and Commerce Comm.) ("H. Rept., Part 1"), https://www.congress.gov/111/crpt/hrpt58/CRPT-111hrpt58-pt1.pdf.

[2] *Id.*

[3] Cong. Rec.—House, H4318, H4339 (Vol. 155, No. 55) (Apr. 1, 2009); Cong. Rec.—House, H6630, H6652 (Vol. 155, No. 88) (June 12, 2009), https://www.congress.gov/congressional-record/2009/04/01/house-section/article/H4318-2.

evidence concerning the public health impacts of menthol in cigarettes.  The Committee was comprised of "a panel of leading public health, scientific experts and representatives of various parts of the tobacco industry."[4]  The FDA, for its part, designated a representative to attend each full Committee and subcommittee meeting; ensure the Committee's compliance with statutory, regulatory, and administrative directives; and approve and prepare all meeting agendas.[5]

The full Committee first met in March 2010, and 11 times thereafter.  *See* FDA Rept. to Congress, *Progress and Effectiveness of the Implementation of the Family Smoking Prevention and Tobacco Control Act*, at 15 (2013).  There were also two meetings of the Tobacco Products Constituents Subcommittee and two meetings of the Menthol Report Subcommittee.  *See id*.  Each of these meetings covered a broad range of materials, presentations, and public submissions.[6]

### A.  The 2011 TPSAC Report:  Menthol harms public health

The Committee then issued its Report on March 23, 2011, and concluded as follows: (1) "Menthol cigarettes have an adverse impact on public health"; and that (2) "There are no public health benefits of menthol compared to non-menthol cigarettes."  *See* TPSAC Menthol Cigarettes and Public Health, at 220 (2011) ("TPSAC Menthol Rept.").[7]

The Committee further found that if menthol cigarettes had been removed from the marketplace in 2010, then (a) by 2020, roughly 17,000 premature deaths would have been avoided, and about 2.3 million people would not have started smoking; and (b) by 2050, the

---

[4] FDA, Dr. Lawrence R. Deyton, Dir. Center for Tobacco Products, *FDA Remarks on the Report and Recommendation on the Public Health Impact of Menthol Cigarettes* (Mar. 18, 2011), https://wayback.archive-it.org/7993/20170112125250/http://www.fda.gov/AdvisoryCommittees/CommitteesMeeting Materials/TobaccoProductsScientificAdvisoryCommittee/ucm247617.htm.

[5] *See* FDA, Charter of the TPSAC (Aug. 7, 2009), https://web.archive.org/web/20090916081752/http://www.fda.gov/AdvisoryCommittees/Co mmitteesMeetingMaterials/TobaccoProductsScientificAdvisoryCommittee/ucm180904.htm.

[6] *See* FDA 2010 TPSAC Mtg. Materials and Info., https://wayback.archive-it.org/7993/20170111122711/http://www.fda.gov/AdvisoryCommittees/CommitteesMeeting Materials/TobaccoProductsScientificAdvisoryCommittee/ucm180903.htm; FDA 2011 TPSAC Mtg. Materials and Info, https://wayback.archive-it.org/7993/20170111122706/http://www.fda.gov/AdvisoryCommittees/CommitteesMeeting Materials/TobaccoProductsScientificAdvisoryCommittee/ucm237359.htm.

[7] *See* https://wayback.archive-it.org/7993/20170405201731/https://www.fda.gov/downloads/AdvisoryCommittees/Committ eesMeetingMaterials/TobaccoProductsScientificAdvisoryCommittee/UCM269697.pdf.

cumulative gains would have resulted in over 327,000 premature deaths avoided, and over 9.1 million people that would not have started smoking. *See id*. at 221–22. For the African American community, this would have meant that (a) by 2020, roughly 4,700 premature deaths would have been avoided, and about 461,000 African Americans would not have started smoking; and (b) by 2050, over 66,000 premature deaths would have been avoided, and over 1.6 million African Americans would not have started smoking. *See id*. at 223.

Thus, the Committee recommended: "**Removal of menthol cigarettes from the marketplace would benefit public health in the United States**." *Id*. at 225 (emphasis in original).

## B. The FDA's 2013 Findings:  Menthol cigarettes are more addictive and harmful than nonmenthol cigarettes

In 2013, FDA completed its own peer-reviewed report and similarly concluded that menthol in cigarettes (a) was associated with greater addiction, less successful quitting, and youth smoking initiation; and (b) likely posed "a public health risk above that seen with nonmenthol cigarettes."[8]  At the time, the Center for Tobacco Products' Director Mitch Zeller acknowledged that "Menthol cigarettes raise[d] critical public health questions," but also noted that "there's "no holdup" on the FDA proposing restrictions on menthol.  Michael Felberbaum, *FDA: Menthol cigarettes likely pose health risk*, USA Today (July 23, 2013).[9]

That same year, plaintiff African American Tobacco Control Leadership Council and several public health groups filed a Citizen Petition, asking the FDA to add menthol to the list of banned characterizing flavors in cigarettes.[10]  In response, Director Zeller noted that the request

---

[8] *See* FDA, Advance Notice of Proposed Rulemaking, *Menthol in Cigarettes, Tobacco Products*, 78 Fed. Reg. 44484, at Reference 1, *Preliminary Scientific Evaluation of the Possible Public Health Effects of Menthol Versus non[-]Menthol Cigarettes*, ID No. FDA-2013-N-0521-0001 (July 24, 2013), https://www.regulations.gov/document?D=FDA-2013-N-0521-0001.

[9] *See* https://www.usatoday.com/story/news/nation/2013/07/23/fda-menthol-cigarettes-health-risk/2578331/.

[10] *See* Public Health Law Center, Citizen Petition: Asking the U.S. Food and Drug Administration to Prohibit Menthol as a Characterizing Flavor in Cigarettes (2013), https://www.publichealthlawcenter.org/sites/default/files/resources/tclc-fdacitizenpetition-menthol-2013.pdf.

4

"raise[d] significant, complex issues" and that the agency would respond "as soon as we have reached a decision on your request."  But for the next five years, FDA made no statement or took any visible actions with respect to menthol.

### C. The FDA's backtracking on any plan to address menthol in cigarettes

In 2018, then-FDA Commissioner Scott Gottlieb noted that, "It was a mistake for the agency to back away on menthol[.]"  Sheila Kaplan, *Altria to Stop Selling Some E-Cigarette Brands That Appeal to Youths*, The New York Times (Oct. 25, 2018).[11]  He then announced that FDA would advance a "Notice of Proposed Rulemaking that would seek to ban menthol in combustible tobacco products, including cigarettes and … ***accelerate*** the proposed rulemaking process to … protect public health[.]"  FDA, Statement from FDA Commissioner Scott Gottlieb, M.D. (Nov. 15, 2018) (emphasis added).[12]

But instead of an accelerated rulemaking process on menthol, FDA—without explanation—appeared to reverse course.  On June 24, 2019, the HHS published its Spring 2019 inventory of rulemaking actions under development.  *See* Reg. Agenda, Ofc. of the Sec., HHS, 84 Fed. Reg. 29623 (June 24, 2019).[13]  This Agenda presented each agency's "regulatory activities" that it "expect[ed] to undertake in the foreseeable future," *id.* at 29624 (citing various proposed rules, final rules, and long-term actions).  Absent from HHS's Spring and Fall inventory, however, was any plan to address menthol in cigarettes, much less any explanation for its silence. *See id.*, *generally*; HHS, Agency Rule List – Fall 2019 (Dec. 26, 2019).[14]

---

[11] *Available at* https://www.nytimes.com/2018/10/25/health/altria-vaping-ecigarettes.html?module=inline.

[12] *See* https://www.fda.gov/news-events/press-announcements/statement-fda-commissioner-scott-gottlieb-md-proposed-new-steps-protect-youth-preventing-access?utm_campaign=111518_Statement_FDA%20Commissioner%20statement%20on%20proposals%20to%20address%20youth%20tobacco%20use&utm_medium=email&utm_source=Eloqua.

[13] *See* https://www.federalregister.gov/documents/2019/06/24/2019-12004/regulatory-agenda.

[14] *See* https://www.reginfo.gov/public/do/eAgendaMain?operation=OPERATION_GET_AGENCY_RULE_LIST&currentPub=true&agencyCode=&showStage=active&agencyCd=0900.

Memorandum of Points and Authorities In Support of Plaintiffs' Motion for Attorneys' Fees and Costs
Case No.: 4:20-cv-4012-KAW

## D.  The harm caused by FDA's undue and unjustified delay

By 2020, however, the harm caused by FDA's unexplained delay was apparent:  In 2009—when the Tobacco Control Act was enacted—menthol cigarettes represented over 25% of all cigarettes smoked in the United States.  *See* H. Rept., Part 1 at 39.  But by 2020, that figure had increased to 36%.[15]  In 2009, more than 12 million smokers reported using menthol cigarettes.  *See id.*  By 2020, there were over 19 million smokers using menthol cigarettes, a majority of the estimated 34 million U.S. smokers.[16]  In 2009, nearly 70% of African Americans smokers used menthol cigarettes.  *See id.*  By 2020, that figure has risen to over 85%.[17]

## III.  Plaintiffs' Complaint and Subsequent Litigation

As a result of defendants' inaction, plaintiffs African American Tobacco Control Leadership Council and Action on Smoking and Health filed their complaint on June 17, 2020.  *See* Compl.  The American Medical Association and National Medical Association later joined as co-Plaintiffs.  *See* 1st Am. Compl. (ECF No. 19); 2d Am. Compl. (ECF No. 41).

Plaintiffs' Complaint alleged violations of the Tobacco Control Act and Administrative Procedure Act ("APA"), specifically that defendants had (a) unduly delayed and unlawfully withheld agency action—including failing to periodically evaluate the flavor ban "to determine whether such standard[] should be changed to reflect new medical, scientific, or other technological data," as required by 21 U.S.C. § 387g(a)(5) (Count I); (b) unduly delayed and unlawfully withheld a substantive response to plaintiff African American Tobacco Control's 2013 Citizen Petition, which sought a tobacco product standard banning menthol in cigarettes (Count

---

[15] *See* Fed. Trade Commission, Cigarette Rept. for 2017, Table 7B (issued 2019), https://www.ftc.gov/system/files/documents/reports/federal-trade-commission-cigarette-report-2017-federal-trade-commission-smokeless-tobacco-report/ftc_cigarette_report_2017.pdf.

[16] *See* FDA, Menthol and Other Flavors in Tobacco Products.  *Available at* https://www.fda.gov/tobacco-products/products-ingredients-components/menthol-and-other-flavors-tobacco-products (last visited June 13, 2020) (noting that more than 19.5 million people are current smokers of menthol cigarettes); Centers for Disease Control and Prevention, Smoking & Tobacco Use, Current Cigarette Smoking Among Adults in the United States (identifying an estimated 34.3 million adults who smoked cigarettes in 2017), https://www.cdc.gov/tobacco/data_statistics/fact_sheets/adult_data/cig_smoking/index.htm.

[17] *See* FDA, Menthol and Other Flavors in Tobacco Products, *id.* (noting that 85.8 percent of African American smokers use menthol cigarettes).

6

II); and (c) in the alternative, made an arbitrary and capricious determination not to ban menthol in cigarettes (Count III).  *See* Compl. at ¶¶ 129–46.

As part of their requested relief, plaintiffs sought, *inter alia*, an Order directing defendants to (a) engage in a Section 387g(a)(5) determination—i.e., "determine whether … [the existing tobacco product] standards should be changed to reflect new medical, scientific, or other technological data" concerning the harms caused by menthol in cigarettes; (b) "respond to the Citizen Petition"; (c) "begin the rulemaking process for adding menthol to the list of characterizing flavors banned by the Tobacco Control Act"; and failing that (d) provide for publication in the Federal Register, the basis for defendants' decision to … add menthol to the list of banned characterizing flavors for combustible cigarettes …."  Compl. at 44.

Shortly after the plaintiffs' filing, the defendants agreed to "commit[] to providing a formal response to plaintiffs' Citizen Petition by January 29, 2021[.]"  Initial Jt. Case Mgmt. Statement, 4 (ECF No. 20).  That commitment was later reflected in the parties' Initial Joint Case Management Statement.  *See id*.

### A.      The September 15, 2020 Order requiring FDA to explain its delay

At the parties' initial conference, the parties discussed filing cross-motions for summary judgment and the need for a declaration from former Director Mitch Zeller (formerly of the Defendant Center for Tobacco Products).  *See* Sept. 15, 2020 Hr'g Tr. at 8 (ECF No. 76).  Per Defendants' counsel, this declaration would explain "the agency's reasons for the delay" and would be produced with defendants' anticipated motion for summary judgment (if a ruling on defendants' anticipated Rule 12 motion to dismiss did not dispose of the action).  *Id*.

After conferring with the parties, this Court identified this declaration as "key information" needed to support plaintiffs' summary judgment motion (*id*. at 9), and thus directed the defendants to produce this declaration two weeks following the Court's Order addressing defendants' anticipated motion to dismiss.  *See id*. at 12–13; *see also* Minute Entry Order (Sept. 15, 2020; ECF No. 25).

**B.      FDA's substantially unjustified position during the litigation**

The parties then briefed and argued defendants' motion to dismiss.  Unhelpfully, defendants explained their position with a double-negative: "FDA has not made a final decision not to regulate menthol cigarettes, full stop."  *See* Defs.' Mot. to Dismiss, 19 (ECF No. 26).  Left unanswered was what FDA had decided.  At oral argument, defendants' counsel clarified (somewhat) that FDA had "in fact made a determination not to regulate," that such determination was "tentative," and that the Court nevertheless lacked jurisdiction because no final decision had been made.  *See* Nov. 5, 2021 Hr'g Tr., 15–16 (ECF No. 36).

This Court found FDA's position "bizarre".  *Id*. at 19–20 ("THE COURT:  But by calling it 'tentative,' I don't even know what that means, and so it's not reviewable … I don't know that there was an actual determination after that based on all of that information, a determination that *Well, we're not ready to make an actual determination.  Our determination is that we're not going to make a determination?*  You know, that's what's bizarre about the argument.") (italics in original).

On November 12, 2020, this Court issued its decision, denying defendants' motion as to Claim I and granting it without prejudice as to Claim III (which was pled in the alternative).  *See* Order at 8–10 (ECF No. 34).  More specifically, the Court rejected defendants' argument that FDA was not obligated to address the public health problems caused by menthol in cigarettes.  *See id*. at 8 (noting that "'even though agency action may be subject to no explicit time limit, a court may compel an agency to act within a reasonable time' under the APA.").  The Court further rejected defendants' suggestion that FDA had satisfied Section 387g(a)(5) through its periodic evaluation of menthol cigarettes, or that FDA could make such "tentative decisions" indefinitely.  *See id.* (noting that "evaluations" are "insufficient," "the statute … states that the FDA must determine whether the standards should be changed. ….  Moreover, to the extent defendants are essentially suggesting that they are permitted to not make a final decision indefinitely, this could constitute a failure to act in a reasonable amount of time.").

**C.      The November 13, 2020 Order committed FDA's formal response to Plaintiffs' Citizen Petition and Section 387g(a)(5) determination**

Given this Court's November 2020 Order, defendants requested a phone conference with plaintiffs on November 13, 2020.  *See* Leung Decl. at ¶ 24.  On the call, defendants' counsel stated that FDA did not want to provide a declaration (pursuant to this Court's September 15, 2020 Order) explaining the agency's delay, competing priorities, or what effect an Order compelling the agency to act might have on its interests (i.e., the "TRAC" factors).  *See id.*

Instead, FDA offered that its anticipated Citizen Petition response would also comply with Section 387g(a)(5)'s determination requirement; that by doing so, defendants would have provided plaintiffs with all their requested relief on their remaining Claims I and II; and that defendants would commit to providing this relief by January 2021.  *See id.*  The parties then exchanged drafts of their considered agreement and conferred further.  *See id.*

On November 20, 2020, the parties submitted their Stipulation and proposed Order to this Court.  *See* Stipulation (ECF No. 39).  This Stipulation noted defendants' obligation to provide a declaration "discussing FDA's grounds for delay under Count I," and defendants' promise to provide instead "all the relief available under plaintiffs' remaining claims: a final response to the citizen petition (the relief sought in Count II) containing a determination of whether to add menthol to the flavor ban (the relief sought in Count I)."  *Id.* at 2.  Defendants would provide this relief by January 29, 2021, and plaintiffs would reserve their right to review and consider FDA's response before accepting that all relief had been provided.  *See id.* at 2–3.

On December 1, 2020, this Court upon consideration of the parties' stipulation and for good cause shown, granted the parties' request to modify and otherwise extend the parties' deadlines.  *See* Order (ECF No. 40) ("PURSUANT TO STIPULATION, IT IS SO ORDERED.").

**i.      FDA's Citizen Petition response and Sec. 387g determination**

Following the Court's December 2020 Order, plaintiffs and several public health organizations then supplemented the 2013 Citizen Petition with additional scientific evidence published after the petition's submission.  As a result, the parties agreed to extend the FDA's

Memorandum of Points and Authorities In Support of Plaintiffs' Motion for Attorneys' Fees and Costs
Case No.: 4:20-cv-4012-KAW

deadline for responding until April 29, 2021.  *See* Stipulation (Jan. 21, 2021; ECF No. 43).  The Court then granted the parties' request.  *See* Order (Jan. 28, 2021; ECF No. 44).

On April 29, 2021, FDA provided its Citizen Petition response and Section 387g(a)(5) determination.  *See* 2d Jt. Case Mgmt. Statement – Attachment A (ECF No. 50-1) ("FDA Cit. Pet. Response").  In essence, FDA determined that it would begin the rulemaking process to add menthol to the list of banned characterizing flavors in cigarettes.  *See id.* at 10, 14.

That said, FDA's formal response declined to identify a date by which it would begin the rulemaking process—i.e., issue a Notice of Proposed Rulemaking.  *See id.*, generally.  While FDA expressed an intention "to make this proposed rule one of the Agency's highest priorities" (*id.* at 14), the agency's response noted that FDA had "broad discretion in deciding whether or not to issue" a product standard (*id.* at 3), that the Tobacco Control Act did "not require or compel FDA to adopt any particular tobacco product standard within any specific time frame" (*id.*)—an argument this Court's November 13, 2020 Order had noted was qualified by the APA—and that FDA would "be facing other priorities and possibly some unforeseen circumstances" (*id.* at 14).

FDA's concurrently issued press statement noted, however, that "The FDA is working toward issuing proposed product standards within the next year to ban menthol as a characterizing flavor in cigarettes[.]"  FDA News Release (Apr. 29, 2021), https://www.fda.gov/news-events/press-announcements/fda-commits-evidence-based-actions-aimed-saving-lives-and-preventing-future-generations-smokers.  But given the nature of this non-binding agency press statement (which are not considered to be "final agency actions"), its aspirational timeline, and former-FDA Commissioner Gottlieb's 2018 empty promise of an accelerated rulemaking process—this latest 2021 press statement by FDA was of dubious value.

### ii.    Plaintiffs' request for a meaningful deadline

To incorporate these post-filing events, plaintiffs supplemented their operative Complaint and included new allegations emphasizing FDA's failure to take steps to publish, much less identify when it would publish a Notice of Proposed Rulemaking.  *See* 2d Am. Compl. (1st Suppl.), ¶¶ 18–19, 142, 145–46 (May 21, 2021; ECF No. 52).  Plaintiffs alleged that FDA's latest 2021 promise to work towards issuing a rule was no different than the empty 2018 statements

made by former FDA Commissioner Gottlieb.  As a result, the plaintiffs renewed their request for relief, in the form of a meaningful deadline by which the FDA would issue a Notice of Proposed Rulemaking.  *See* 2d Jt. Case Mgmt. Statement, 2 (May 18, 2021; ECF No. 50).

In response, defendants declined to commit to a date certain and asked this Court to dismiss plaintiffs' amended claims as moot.  *See id.* at 2, 3.  The parties then briefed defendants' second motion to dismiss, and provided supplemental briefing in response to this Court's request. In its briefing, defendants' papers referred back to FDA's press statement, and argued that FDA had "set an expected date for publication of the NPRM within twelve months" (Defs.' Reply ISO 2d Mot. To Dismiss; ECF No. 59)—i.e., by April 29, 2022.  Noticeably absent, however, was any supporting affidavit from or declaration from the agency agreeing as much.

### iii.    The November 17, 2021 Order set a meaningful deadline for FDA's Notice of Proposed Rulemaking

On November 17, 2021, the Court then issued an Order identifying the "primary issue" in dispute as "whether defendants have engaged in undue delay in promulgating the Notice of Rulemaking."  Order, 3 (ECF No. 73).

This Court noted that "FDA intended to issue a notice of rulemaking by April 2022, or in approximately five months," and cautioned that "[i]f the FDA does not issue the Notice of Rulemaking, the Court may find that the delay is unreasonable under the factors set forth in *Telecommunications Research and Action Center v. FCC* ("TRAC") for determining unreasonable delay." *Id.* at 3.  The Court reemphasized that given the "significant threat to human health posed by menthol cigarettes … [s]hould the FDA not issue a notice of rulemaking in the year since granting Plaintiff's citizen petition, a delay of more than one year could very well be unreasonable (particularly as that delay continues). ….  In short, whether the FDA issues the Notice of Rulemaking as currently planned is potentially determinative to the Court's disposition of the pending motion to dismiss."  *Id.* at 3–4.  As a result, this Court held defendants' motion in abeyance to give the FDA an opportunity to issue the Notice on its stated schedule. *Id.* at 4.

Memorandum of Points and Authorities In Support of Plaintiffs' Motion for Attorneys' Fees and Costs
Case No.: 4:20-cv-4012-KAW

iv.   **FDA's promulgated Notice of Proposed Rulemaking**

On April 28, 2022, FDA issued plaintiffs' requested Notice of Proposed Rulemaking.  *See* FDA, Tobacco Product Std. for Menthol in Cigarettes, 87 Fed. Reg. 26454, 26454 (May 4, 2022) (proposing to create a new tobacco product standard adding menthol as a banned characterizing flavor in cigarettes).[18]  This proposed standard (if finalized) is expected to "reduce the appeal of cigarettes, particularly to youth and young adults," increase quitting among smokers, reduce health disparities, advance health equity, and over time, result in $102 billion to $353 billion in annualized benefits per year.  *See id*. at 26,454, 26,456.  This was a "significant step praised by leading health and civil rights groups," including NAACP president and chief executive Derrick Johnson who stated, "Today is a huge win for equity, justice, and public health concerns."  Laurie McGinley, *In a milestone, FDA proposed ban on menthol cigarettes, flavored cigars*, Washington Post (Apr. 28, 2022), https://www.washingtonpost.com/health/2022/04/28/fda-menthol-ban/.

**ARGUMENT**

Under the Equal Access to Justice Act ("EAJA"), a "party" who prevails against the federal government is entitled to reasonable attorneys' fees and costs upon a showing that (1) the party seeking fees is "a prevailing party," (2) the government fails to show that its position was "substantially justified," and (3) there are no "special circumstances rendering an award unjust."  *Meza-Vazquez v. Garland*, 993 F.3d 726, 728 (9th Cir. 2021) (citing 28 U.S.C. § 2412(d)(1)(A)).

As detailed below, each factor weighs in favor of granting plaintiffs' request.

**I.   Plaintiffs are the "prevailing party."**

Under the EAJA, a "prevailing party" is a litigant who (a) "achieve[s] a 'material alteration of the legal relationship of the parties'" that is (b) "judicially sanctioned."  *Carbonell v. INS*, 429 F.3d 894, 898 (9th Cir. 2005) (quoting *Buckhannon Bd. & Care Home, Inc. v. West Virginia Dep't of Health & Human Res.*, 532 U.S. 598, 604–05 (2001)).

Notably, "procedural remedies can constitute a material alteration in the parties' legal relationship," *Wood v. Burwell*, 837 F.3d 969, 974 (9th Cir. 2016) (citing cases), as can remedies

---

[18] *See* https://www.federalregister.gov/documents/2022/05/04/2022-08994/tobacco-product-standard-for-menthol-in-cigarettes.

based "exclusively on injunctive relief," *Fischer v. SJB-P.D. Inc.*, 214 F.3d 1115, 1118 (9th Cir. 2000) (citing *Friend v. Kolodzieczak*, 72 F.3d 1386, 1390 (9th Cir. 1995). A court's order incorporating parties' voluntary agreement also suffices. *See Carbonell*, 429 F.3d at 901 (reversing the lower court's denial of prevailing party status, where party obtained a court order incorporating stipulation staying deportation); *Fischer*, 214 F.3d at 1118.

### A. Plaintiffs received much of their requested relief from this Court.

Here, plaintiffs' primary relief sought was (a) a formal Section 387g(a)(5) determination by FDA to determine whether to ban menthol as a characterizing flavor in cigarettes; (b) a formal response to plaintiffs' 2013 Citizen Petition; and (c) assuming FDA's determination to add menthol to such list, then FDA's promulgation of a Notice of Proposed Rulemaking within a set time. Short of obtaining such relief, plaintiffs sought (d) an explanation from FDA for its delay in addressing the critical health problem of menthol in cigarettes. And plaintiffs obtained each of these forms of relief from this Court's Orders issued on September 15, 2020, November 12, 2020, December 1, 2020, and November 15, 2021.

### 1. The September 15 and November 12 Orders directed FDA to explain its delay in addressing menthol.

First, following the parties' initial conference held on September 15, 2020, the Court issued an Order directing defendants to provide an explanation for the agency's delay, should defendants' motion to dismiss fail to resolve plaintiffs' alleged claims.

That direction became effective upon this Court's November 12, 2020 Order, denying defendants' first motion to dismiss plaintiff's Claim I (seeking a Section 387g(a)(5) determination). As this Court previously noted, this relief (i.e., the Zeller Declaration) would be "key" to plaintiffs' anticipated summary judgment motion.

### i. The December 1 Order formalized FDA's promise to provide a Citizen Petition response and Sec. 387g(a)(5) determination

The plaintiffs then obtained FDA's Citizen Petition response and Section 387g(a)(5) determination, pursuant to the parties' November 20, 2020 Stipulation that this Court later incorporated into its December 1, 2020 Order.

Memorandum of Points and Authorities In Support of Plaintiffs' Motion for Attorneys' Fees and Costs
Case No.: 4:20-cv-4012-KAW

Per the parties' Stipulation, the FDA agreed to provide a response by January 29, 2021 to plaintiffs' Citizen Petition that would also double as the agency's Section 387g(a)(5) determination.  In exchange, plaintiffs agreed to waive their right to the Zeller Declaration, agreed to extend the remaining deadlines, and reserved their right to determine from FDA's response whether the agency had provided plaintiffs' requested relief.  The parties submitted this agreement to the Court, which—upon consideration of the Stipulation and for good cause shown, granted the request ("Pursuant to Stipulation") in its December 1, 2020 Order.

### ii. The November 17 Order set a meaningful timeline for FDA to issue a Notice of Proposed Rulemaking

Finally, plaintiffs also received their requested relief concerning a date certain (or else a timetable) by which the FDA would issue a Notice of Proposed Rulemaking.  That relief was provided through this Court's November 17, 2021 Order.

Following FDA's April 29, 2021 Citizen Petition Response / Section 387g(a)(5) determination, the parties' dispute then centered on whether—and by when—FDA was obligated to issue a Notice of a Proposed Rulemaking.  FDA's Response declined to commit to a timetable and FDA argued that plaintiffs' supplemented claims were moot.  Plaintiffs argued that defendants' response was inadequate because the agency had not committed to issuing a Notice of Proposed Rulemaking by a date certain.[19]

After rounds of briefing by the parties, this Court issued its November 17, 2021 Order, identifying the primary dispute as "whether defendants have engaged in undue delay in promulgating the Notice of Rulemaking.  (*See* Pls.' Opp'n at 24–25.)."  That Order then put FDA clearly on notice that if it did not issue the Notice of Rulemaking by April 2022, "the Court may find that the delay is unreasonable under the factors set forth in *Telecommunications Research and*

---

[19] Confusingly, FDA appeared to state three different positions: (1) per its Citizen Petition response, it was not obligated and would not commit to setting a date by which to issue a Notice of Proposed Rulemaking; (2) per its concurrently issued press statement—i.e., an aspirational statement by the agency that would not qualify as a reviewable "final agency action"—FDA stated that it was "working toward issuing proposed product standards within the next year"; and (3) per the filings before this Court—i.e., a memorandum of law, and not a sworn declaration or affidavit by the agency—FDA's filings stated that it "set an expected date for publication of the NPRM within twelve months," Defs.' Reply ISO 2d MTD; ECF No. 59—i.e., by April 29, 2022.

Memorandum of Points and Authorities In Support of Plaintiffs' Motion for Attorneys' Fees and Costs
Case No.: 4:20-cv-4012-KAW

*Action Center v. FCC* ("TRAC") for determining unreasonable delay." *Id.* at 3. The Court's Order noted that *In re a Community Voice*, 878 F.3d 779, 787 (9th Cir. 2017), was "most instructive," and reiterated that "[s]hould the FDA not issue a notice of rulemaking in the year since granting Plaintiff's citizen petition, a delay of more than one year could very well be unreasonable (particularly as that delay continues). Further, as plaintiffs observe, other TRAC factors could support a finding of undue delay, as the FDA has described a final rule banning menthol as "'one of the agency's highest priorities.'" *Id.* at 4.

That Order then held defendants' motion to dismiss hearing in abeyance "to give the FDA an opportunity to issue the Notice of Rulemaking on its stated schedule." *Id.*

Here, in essence, this Court's November 17 Order "materially altered" the parties' legal relationship by effectively transforming FDA's one-year, aspirational timeline (to issue a Notice of Proposed Rulemaking) into a concrete deadline. Whereas before the Court's Order, FDA had the self-professed discretion to issue such a Notice whenever it wanted—this Court's Order now put FDA on notice that if the agency missed its "expected" April 2022 publication date, legal consequences could attach. In short, the Court's Order effectively granted plaintiffs' requested relief for a date certain.

Thus, because plaintiffs "received much of the relief [they] sought" (*Carbonell*, 429 F.3d at 901) and because such relief was provided by this Court's Orders, plaintiffs are appropriately considered the prevailing party. *See id.* at 901 n.5 (noting that "[a] party need not succeed on every claim in order to prevail. Rather, a plaintiff prevails if he has succeeded on any significant issue in litigation which achieved some of the benefit [he] sought in bringing suit.") (citing cases) (internal quotations omitted).

### B. Each requesting Plaintiff is a "party" within the meaning of the Act

Finally, because plaintiffs African American Tobacco Control Leadership Council, Action on Smoking and Health, and National Medical Association[20] each fall within the EAJA's

---

[20] Although plaintiff American Medical Association is not seeking attorneys' fees or costs, it supports its co-plaintiffs' application and its presence in this litigation does not somehow bar its co-plaintiffs' application. *See, e.g.*, *League for Coastal Prot. v. Kempthorne*, No. C 05-0991-CW, 2006

Memorandum of Points and Authorities In Support of Plaintiffs' Motion for Attorneys' Fees and Costs
Case No.: 4:20-cv-4012-KAW

definition of a "party" (28 U.S.C. § 2412(d)(2)(B) (defining a "party" to include a tax-exempt 501(c)(3) organization, and any "association" or "organization" having a net worth of no more than $7 million and no more than 500 employees), each requesting plaintiff is eligible to receive an award of attorneys' fees and other expenses.  *See* McGruder Decl.; Hubert Decl., Clunie Decl.

## II.    FDA fails to meet its "heavy burden" to show that an exception applies

"Once a party's eligibility has been proven, an award of fees under EAJA is mandatory unless the government's position is substantially justified or special circumstances exist that make an award unjust." *Love v. Reilly*, 924 F.2d 1492, 1495 (9th Cir. 1991).  The burden of proving either exception rests with the government.  *See id.*  And notably, a "strong showing" is required. *Nat. Res. Def. Council v. Env't Prot. Agency*, 703 F.2d 700, 712 (3d Cir. 1983); *Env't Defense Fund, Inc. v. Watt*, 722 F.2d 1081, 1085 (2d Cir. 1983).

Here, for the reasons detailed below, defendants cannot meet their burden to show that either exception applies.

### A.    The FDA's prelitigation position was not substantially justified

The "substantial justification" test is "comprised of two inquiries one directed toward the government agency's conduct, and the other toward the government's attorneys' conduct during litigation." *Ibrahim v. U.S. Dep't of Homeland Sec.*, 912 F.3d 1147, 1168 (9th Cir. 2019) (en banc). Defendants must show both that (a) the agency misconduct that gave rise to the litigation was substantially justified; and (b) that its litigation positions also were substantially justified.  *See id.*; *INS v. Jean*, 496 U.S. 154, 158–60 (1990).  Accordingly, if a court finds that the agency's underlying, prelitigation conduct lacks substantial justification, the court need not consider whether the agency's litigation positions were justified.  *See Jean*, 496 U.S. at 160; *Meier v. Colvin*, 727 F.3d 867, 872 (9th Cir. 2013).[21]

---

WL 3797911, at *3 (N.D. Cal. Dec. 22, 2006) (holding that Sierra Club's ineligibility as a "party" under the EAJA did not bar its co-plaintiffs' request for reasonable attorneys' fees).

[21] *See also United States v. 515 Granby, LLC,*736 F.3d 309, 316 (4th Cir. 2013) ("[W]hen the government's unjustified prelitigation position forces a lawsuit, the petitioner may recover fees under the EAJA for the entire suit, even if the government's litigation position was reasonable."); *Anthony v. Sullivan*, 982 F.2d 586, 589 (D.C. Cir. 1993).

16

1        Here, FDA cannot meet its heavy burden to show that their underlying conduct leading

2  up to this litigation—i.e., FDA's failure to respond to plaintiffs' 2013 Citizen Petition, and failure

3  to "determine" whether to add menthol to the list of banned characterizing flavors—was

4  somehow substantially justified.  Since 2009, FDA knew that Congress was especially concerned

5  with the problem of menthol in cigarettes, and its effect on youth and African American smokers.

6  FDA further knew that Congress had entrusted the Secretary of HHS "to move quickly" and to

7  "address these issues as quickly as practicable."  H. Rept., Part 1 at 38–39.  Since 2011, FDA

8  knew that removing menthol cigarettes from the marketplace would "benefit public health in the

9  United States," and that the cumulative gains from taking such action would result in potentially

10  over 327,000 premature deaths being avoided and over 9.1 million people that would not have

11  started smoking.  FDA furthermore knew as of 2013, that menthol cigarettes were associated with

12  youth smoking, and were more addictive than nonmenthol cigarettes.

13        And yet, for years—i.e., until the filing of this lawsuit, the parties' litigation, and this

14  Court's direction and Orders—FDA did nothing with respect to addressing menthol, except talk

15  about taking action, acknowledge that "[i]t was a mistake for the agency [FDA] to back away on

16  menthol," and avoid acting on the mountain of evidence presented by its own 2011 TPSAC

17  Report, 2013 agency findings, and years of studies following that only reinforced TPSAC's

18  original conclusion.  As a result of FDA's inaction, thousands of lives were needlessly lost and

19  millions more began smoking.  As noted above, the menthol cigarette market increased from

20  25% (in 2009 when the Tobacco Control Act was enacted) to 36% (as reported by the federal

21  government in 2019).  The number of smokers who reported using menthol cigarettes increased

22  from 12 million (in 2009) to over 19.5 million (in 2020).  And the percentage of African

23  Americans who smoked using menthol cigarettes rose from 70% (in 2009) to over 85% (in 2020).

24        How FDA could "substantially justify" its empty promises, inaction, and measured

25  outcome seems unfathomable.  Accordingly, this Court should find that this exception does not

26  apply here, and may omit any consideration of whether FDA's litigation positions were justified.

27  *See Jean*, 496 U.S. at 160; *Meier*, 727 F.3d at 872.

28

1

**B.      The FDA's litigation position was not substantially justified**

2        That said, if this Court were inclined to explore FDA's litigation positions, this Court's

3   ultimate analysis would remain unchanged—any substantial justification by FDA is lacking.  For

4   example, during oral argument on defendants' first motion to dismiss, FDA's counsel at the time

5   suggested that FDA had in fact, made a series of evaluations and tentative decisions on menthol,

6   but had refrained from making a Section 387g(a) "determination" or any actual final agency

7   action.  This Court correctly identified this argument as "bizarre," and in its subsequent

8   November 12, 2020 Order rejected this argument (and apparent agency course of action) as a

9   potential violation of the Administrative Procedure Act ("APA").

10        Despite the Court's express caution, FDA in its later Citizen Petition response again

11   emphasized that the agency was not under a deadline to issue a Notice of Proposed Rulemaking

12   under the Tobacco Control Act.  Left out, of course, was any consideration of the Administrative

13   Procedure Act and its effect on the agency's actions, or else this Court's earlier admonition

14   regarding the same.

15        In fact, the only presented semblance of a timetable appeared—not in FDA's Citizen

16   Petition Response—but in (a) an FDA press release, identifying the aspirational nature of the

17   agency's goal, and (b) defendants' briefs filed in their second motion to dismiss (i.e., not a sworn

18   FDA affidavit or declaration).  Such statements, however, lacked the indicia of a legally binding,

19   agency statement.  *See Arrow Reliance, Inc. v. Woodcock*, Case No. 22-1057, 2022 U.S. Dist. Lexis

20   138988, * 8–9 (W.D. Wash. Aug. 4, 2022) (holding that an FDA press release would not

21   constitute a binding "final agency action").  Indeed, FDA made this same point just this year—

22   i.e., that "agency press releases and public statements … are not 'agency action' subject to review

23   under the APA."  Leung Decl., Ex. K (Defs' Opp. to Pl.'s Mot. For a TRO and PI, at 6 (Aug. 1,

24   2022; ECF No. 11) (arguing that "agency communications—including FDA warning letters—

25   that merely state the agency's position on a mater within its purview … have no legal effect")).

26   (Attached as Leung Decl., Ex. K).

27        In sum, FDA—rather than attempting to resolve the critical public health problem it had

28   acknowledged in 2013—was again seeking to avoid committing itself to a definitive timetable by

18

suggesting its press release statement was somehow a meaningful or binding statement to FDA—it was not.  Such litigation tactics should not be condoned, much less be considered "substantially justified."  In short, defendants fail to meet their heavy burden to show that the substantial justification exception somehow applies—it does not.

### C.  Equitable considerations weigh in favor of Plaintiffs' fee petition

Finally, FDA fails to identify any special circumstances that would make an award of attorneys' fees and costs unjust.  The "special circumstances" exception to eligibility under EAJA is a "'safety valve' [that] … gives the court discretion to deny awards where equitable considerations dictate an award should not be made."  H.R. Rep. No. 1418, 96th Cong., 2nd Sess. 5, 11, reprinted in 1980 U.S.C.C.A.N. 4984, 4990.

Given the facts and circumstances in this case, the equities do not tip in favor of defendants.  As others have recognized, FDA's "historic action" to prohibit menthol in cigarettes was "in response to" plaintiffs' 2013 Citizen Petition and instant lawsuit.  *See* Campaign for Tobacco-Free Kids, Press Release (Apr. 29, 2021), https://www.tobaccofreekids.org/press-releases/2021_04_29_fda-menthol-announcement.  Furthermore, if FDA finalizes this proposed rule, the benefits to public health will be enormous.[22]  As noted earlier, such a rule will among other things, "reduce the appeal of cigarettes, particularly to youth and young adults," increase quitting among smokers, reduce health disparities, advance health equity, and result in between $102 billion and $353 billion in annualized benefits per year.[23]

---

[22] "This is one of the most important opportunities we've had in tobacco control in a long time," said Michele Bloch, M.D., Ph.D., chief of NCI's Tobacco Control Research Branch.  And per a senior science advisor in FDA's Center for Tobacco Products, "This is a very large public health step ….  Combined with continued efforts at prevention and cessation, these actions will have significant public health benefits."  Nat'l Cancer Inst., FDA Proposed Rule Prohibiting Menthol Cigarettes (June 27, 2022), https://www.cancer.gov/news-events/cancer-currents-blog/2022/fda-proposes-rule-prohibiting-menthol-cigarettes.

[23] As a point of comparison, those quantified benefits would make a significant impact on the annual cost of smoking in the United States of more than $600 billion (*see* CDC, Smoking & Tobacco Use (last reviewed July 26, 2022), https://www.cdc.gov/tobacco/data_statistics/fact_sheets/economics/econ_facts/index.htm), and would be significantly larger than FDA's 2023 fiscal year budget, *see* FDA, FY 2023 FDA Budget Summary (last visited Aug. 28, 2022), https://www.fda.gov/media/157193/download#:~:text=The%20FY%202023%20budget%20provides,infrastructure%2C%20buildings%2C%20and%20facilities.

In short, because plaintiffs' litigation has set FDA on a course to protect and improve public health—a course that will avoid potentially hundreds of thousands of premature deaths, and keep millions more from starting smoking—the equities tip in favor of granting plaintiffs' request for reasonable attorneys' fees and costs.  *See Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983) (holding that "Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee.  Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified.").

**III.   Plaintiffs' requested fees and costs are presumptively reasonable.**

Once a court determines that a plaintiff is eligible to receive fees under EAJA, it must determine the rates for those fees.  The EAJA provides for "reasonable attorney fees" to prevailing parties.  *See* 28 U.S.C. § 2412(d)(2)(A).

Here, because plaintiffs meet the criteria for an award under EAJA, they are entitled to recover their reasonable attorney fees and other expenses from the government.  "The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley*, 461 U.S. at 433; *see also Costa v. Comm'r of Soc. Sec. Admin.*, 690 F.3d 1132, 1135 (9th Cir. 2012).  The resulting "lodestar" amount is "presumptively reasonable." *In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d 935, 941–42 (9th Cir. 2011).

**A.    Plaintiffs seek reasonable hourly rates.**

With respect to the appropriate hourly rate for plaintiffs' counsel, although EAJA establishes a fee recovery rate of $125 per hour (that is adjusted to account for cost-of-living increases), a court may award a party market rates that exceed the base EAJA statutory rate if there exists "a special factor, such as the limited availability of qualified attorneys for the proceedings involved."  28 U.S.C. § 2412(d)(2)(A).  Enhanced hourly rates are also appropriate under EAJA "where the attorneys possess distinctive knowledge and specialized skill that was needful to the litigation in question and not available elsewhere at the statutory rate." *Nadarajah v. Holder*, 569 F.3d 906, 912 (9th Cir. 2009).

In this proceeding, an enhanced hourly rate should apply to plaintiffs' counsel

20

Christopher Leung and Liana Vitale.[24]  As set forth by the supporting Declaration of Leonard Nelson, Senior Assistant General Counsel to the plaintiff American Medical Association ("AMA"), there were an extremely limited number of qualified attorneys available and willing to litigate this case.  Furthermore, Mr. Leung and Ms. Vitale possess a distinctive combination of knowledge and skills that were needed for the litigation here—i.e., a high-stakes, complex civil litigation skillset and background, involving challenging issues of administrative law.

### 1.      Limited availability of counsel

As set forth in his Declaration, Mr. Nelson has been employed by the AMA since 1998 as a Senior Assistant General Counsel.  *See* Nelson Decl. at ¶ 1.  In this role, Mr. Nelson is responsible for overseeing the AMA's litigation docket and evaluating lawsuits the AMA is asked to join.  *See id*. at ¶ 11.  Through his work, he has become familiar with the work product of hundreds of lawyers, as well as the billing rates in several large cities including Chicago, Washington D.C., New York, and San Francisco.  *See id*.

Before the initial filing of this Complaint, Mr. Nelson spoke with several law firms about bringing a case against the U.S. Department of Health and Human Services (and their subagency the FDA) for their inaction on the public health harms caused by menthol cigarettes.  *See id*. at ¶ 13.  None of those law firms were able to suggest the combination of a viable legal theory, a willingness to take the case, and a suitable legal fee (or hourly rate).  *See id*. at ¶ 14.  And each of those other law firm's non-pro bono (i.e., market) hourly rates were well-above those requested by plaintiffs' counsel in this litigation.  *See id*.  In short, no other qualified counsel was available to take this case at the EAJA rate of $125 per hour adjusted for inflation.  *See id*. at ¶ 25.

Here, plaintiffs are requesting an enhanced hourly rate of $700 for Mr. Leung's time and $500 for Ms. Vitale's time.  The following evidence further establishes the reasonableness of counsel's requested rates:

### i.      Counsel's skill and expertise

Plaintiffs' firm Pollock Cohen LLP specializes in high stakes, plaintiff-side complex civil

---

[24] Plaintiffs are not seeking a specialized rate for attorney James Wiseman, and are instead requesting that the EAJA statutory rate apply for his work in this case.

Memorandum of Points and Authorities In Support of Plaintiffs' Motion for Attorneys' Fees and Costs
Case No.: 4:20-cv-4012-KAW

litigation.  *See* Leung Decl. at ¶ 5.  Both Mr. Leung and Ms. Vitale are highly experienced

attorneys, with Mr. Leung having graduated from the University of California at Hastings

College of the Law in 2000, and Ms. Vitale having graduated from New York University School

of Law in 2008.  *See id*. ¶ 15, 19.  As detailed in attached supporting declaration, plaintiffs'

attorneys each further possess distinctive knowledge and skills that were needed in the litigation

and were unavailable elsewhere at the statutory rate.  *See Love*, 924 F.2d at 1496; *Pollinator*

*Stewardship Council v. U.S. EPA*, No. 13-72346, 2017 WL 3096105, at *2–7 (9th Cir. 2017).

Specifically, Mr. Leung and Ms. Vitale each possessed a background and skillset in complex civil

litigation.  Mr. Leung furthermore possessed a distinctive knowledge of administrative law,

tobacco matters, and public health (environmental justice) actions.  *See* Leung Decl. ¶¶ 8-19; *see*

*also* Nelson Decl. at ¶ 14.[25]

### ii.    Prevailing market rates in the community

A reasonable hourly rate must be based on the "prevailing market rates in the relevant

community."  *See Bell v. Clackamas County*, 341 F.3d 858, 868 (9th Cir. 2003).  "Generally, when

determining a reasonable hourly rate, the relevant community is the forum in which the district

sits," *i.e.,* here, the Northern District of California.  *Camacho v. Bridgeport Financial, Inc.*, 523 F.3d

973, 979 (9th Cir. 2008).  "Affidavits of the plaintiffs' attorney and other attorneys regarding

prevailing fees in the community, and rate determinations in other cases, particularly those

setting a rate for the plaintiffs' attorney, are satisfactory evidence of the prevailing market rate."

*United Steelworkers of America v. Phelps Dodge Corp.*, 896 F.2d 403, 407 (9th Cir. 1990).  The

established standard for determining a reasonable hourly rate is the "rate prevailing in the

---

[25] As a point of comparison, when defendants sought to argue their first motion to dismiss, defendants relied on former U.S. Department of Justice attorney Daniel Feith—presumably because of Mr. Feith's background and skill in complex civil litigation and administrative law.  *See* Nov. 5, 2021 Hr'g Tr. (ECF No. 36) (D. Feith arguing on behalf of the defendants).  According to his current web bio, Mr. Feith previously clerked for Chief Justice John G. Roberts on the U.S. Supreme Court, served as deputy assistant attorney general for the U.S. Justice Department's Consumer Protection Branch, where he led the Department's efforts to enforce the Food Drug and Cosmetic Act, and defend the FDA in administrative litigation.  Now at Sidley, his practice focuses on regulatory and complex civil litigation, "often involving difficult questions of constitutional, statutory, and administrative law."  Sidley, Counsel, https://www.sidley.com/en/people/f/feith-daniel-j.

Memorandum of Points and Authorities In Support of Plaintiffs' Motion for Attorneys' Fees and Costs
Case No.: 4:20-cv-4012-KAW

community for similar work performed by attorneys of comparable skill, experience, and reputation." *Camacho v. Bridgeport Financial, Inc.*, 523 F.3d 973, 979 (9th Cir.2008) (quoting *Barjon v. Dalton*, 132 F.3d 496, 502 (9th Cir.1997)).  Courts also may rely on previous court decisions awarding similar rates for work in the same geographical area by attorneys with comparable levels of experience. *See, e.g., Nadarajah*, 569 F.3d at 917.

As explained further by the plaintiffs' supporting declaration, the hourly rate determinations in other recent cases in the Northern District of California for similar work, *i.e.,* complex civil litigation, by attorneys of comparable skill and experience at firms also support the reasonableness of plaintiffs' counsels' requested rates.  In *Perez v. Rash Curtis & Assocs.,* Case No. 4:16-cv-03396-YGR, 2020 WL 1904533 (N.D. Cal. Apr. 17, 2020), for example, the court collected cases in this judicial district reflecting the following rates as reasonable for "complex, high-stakes litigation" in the "San Francisco Bay Area":

- $845 to $1200 for "senior attorneys" (2016)
- $870 to $1200 for "senior attorneys" (2017)
- $950 for "partners" (2010) (*see Loretz, supra* )
- Up to $975 for "partners" and $800 for "non-partner attorneys" (2015)

*Id.* at * 20 (citations omitted).

Fee awards to attorneys from local firms that handle other complex civil litigation further support the reasonableness of counsels' requested rates.  In sum, these reported Northern District cases further establish the reasonableness of counsel's requested hourly rates of $700 and $500 for Mr. Leung and Ms. Vitale, respectively, *i.e.,* at the lower end of the range for rates that have been approved for attorneys of comparable seniority in the Northern District both recently and as long as five to ten years ago, in cases involving complex civil litigation and/or other San Francisco Bay Area firms that handle plaintiffs' side cases.

### B.    Plaintiffs seek reasonable time.

Plaintiffs' counsel also seek reasonable hours on this litigation.  An eligible party under the EAJA is generally awarded fees "for all time reasonably expended in pursuit of the ultimate result achieved in the same manner that an attorney traditionally is compensated by a fee-paying client

for all time reasonably expended on a matter."  *Hensley*, 461 U.S. at 431; *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1202 (9th Cir. 2013) ("Ultimately, a reasonable number of hours equals the number of hours which could reasonably have been billed to a private client.").  Such time includes "[o]f course, some of the services performed before a lawsuit is formally commenced by the filing of a complaint are performed 'on the litigation.'  Most obvious examples are the drafting of the initial pleadings and the work associated with the development of the theory of the case." *Webb v. Bd. of Educ. of Dyer Cnty., Tenn.*, 471 U.S. 234, 243 (1985); *Latoya A. v. S.F. Unified Sch. Dist.*, No. 3:15-cv-04311-LB, 2016 U.S. Dist. LEXIS 11048, at *21 (N.D. Cal. Jan. 28, 2016).

"By and large, the court should defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case; after all, he won, and might not have, had he been more of a slacker." *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008).  Moreover, hours supported by counsel's documentation are presumptively reasonable.  *United Steelworkeres v. Phelps Dodge Corp.*, 896 F.2d 403, 406–07 (9th Cir. 1990) ("We emphasize that hours actually expended in the litigation are not to be disallowed without a supporting rationale.").

Here, as detailed above, counsel for plaintiffs spent a total of 599.3 hours through August 30, 2022 on this case, which included the major tasks listed in the Leung Declaration.  *See* Leung Decl., Ex. B.  Counsel kept time records in the regular course of business in six-minute increments documenting their work throughout this matter.  *See id.* at Ex. B.

Plaintiffs' counsel have also exercised their "billing judgment" to exclude certain time from their fee application.  *See Prison Legal News v. Schwarzenegger*, 561 F.Supp.2d 1095, 1104 (N.D. Cal. 2008) (declining to further reduce hours based on excessiveness, where plaintiffs' attorneys had already reviewed their billing records and made discrete billing reductions).  Such excluded time includes and is not limited to redundant or excessive time spent on tasks, certain time entries defendants objected to, contact with the press or drafting press materials, work on purely clerical matters, and substantial time spent on the case but simply not billed.  *See* Leung Decl. at ¶ 33.

In total, counsel estimate that they have excluded at least 15% from their hours from their fee petition for such billing judgment.  *See id.* at ¶ 34.  Based on the foregoing, counsel have adequately shown the reasonableness of their requested hours.

24

### iii.   Plaintiffs are entitled to fees in preparing this fee application

Plaintiffs are also entitled to attorneys' fees incurred in preparing this EAJA application. *See INS v. Jean*, 496 U.S. 154, 166 (1990); *Atkins v. Apfel*, 154 F.3d 986, 989 (9th Cir. 1998).  To that end, plaintiffs respectfully request an opportunity to submit a supplemental declaration evidencing their time spent litigating this fee application following their reply and any argument. *See Davis v. Prison Health Servs.*, No. C 09-2629 SI, 2012 WL 4462520 at *16 (N.D. Cal. Sept. 12, 2012) (granting fee award and directing counsel to submit within 14 days "a supplemental declaration detailing the time spent on the fee application, as well as any costs that are sought").

### C.   Plaintiffs are entitled to recover costs and expenses.

The EAJA further allows plaintiffs to recover their costs and "other expenses" incurred in litigation.  28 U.S.C. § 2412(d)(1)(A); *see Int'l Woodworkers of America v. Donovan*, 792 F.2d 762, 767 (9th Cir. 1986) (noting that such expenses include those "normally billed to a client").  Plaintiffs here seek $534.10 in costs and expenses, including filing fees and postage.  *See* Leung Decl. Ex. A. These costs were reasonably incurred and necessary to plaintiffs' success in this case.

## CONCLUSION

For all the foregoing reasons, the plaintiffs African American Tobacco Control Leadership Council, Action on Smoking and Health, and National Medical Association ask that this Court grant their motion for reasonable attorneys' fees and costs.


Date:   August 30, 2022
        New York, NY

                                        Respectfully submitted,

                                        */s/ Christopher K. Leung*
                                        Christopher K. Leung (SBN 210325)
                                        Pollock Cohen LLP
                                        111 Broadway, 18th Fl.
                                        New York, NY 10006
                                        Tel.: (212) 337-5361
                                        Fax.: (347) 696-1227
                                        Chris@PollockCohen.com

                                        *Counsel for Plaintiffs African American*
                                        *Tobacco Control Leadership Council, Action on*
                                        *Smoking and Health, American Medical*
                                        *Association, and National Medical Association*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Memorandum of Points and Authorities In Support of Plaintiffs' Motion for Attorneys' Fees and Costs
Case No.: 4:20-cv-4012-KAW